**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**EQUAL EMPLOYMENT OPPORTUNITY**
**COMMISSION (EEOC)**                                          **PLAINTIFF**

**V.**                      **CASE NO. 5:23-CV-5164**

**CRAIN AUTOMOTIVE HOLDINGS, LLC and**
**CRAIN K OF NWA, LLC d/b/a CRAIN KIA OF**
**BENTONVILLE d/b/a CRAIN KIA OF NWA**                **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This is a Title VII retaliation case brought by the EEOC on behalf of charging party

Galen Taylor against his former employer, Crain Automotive Holdings, LLC and Crain K

of NWA, LLC (collectively, "Crain").   Now before the Court are Defendants' Motion for

Summary Judgment (Doc. 37), Plaintiff and Defendants' Cross Motions for Partial

Summary Judgment on Conciliation (Docs. 22 & 40), and Plaintiff's Motion to Strike (Doc.

51).  In ruling on these motions, the Court has also reviewed the parties' responses and

replies (Docs. 45, 53, 55 & 57).  For the reasons that follow, Plaintiff's Motion for Partial

Summary Judgment (Doc. 22) is **GRANTED**, Defendants' Cross Motion (Doc. 40) is

**DENIED**, and Plaintiff's Motion to Strike (Doc. 51) is **GRANTED IN PART AND DENIED**

**IN PART**.  Defendants' Motion for Summary Judgment (Doc. 37) is **DENIED**.

**I. FACTS**

Galen Taylor worked for Crain as a car salesman.  (Doc. 46, ¶ 10).  He started at

Crain Kia of Bentonville in October 2021, did a brief stint at Crain Kia Superstore of Fort

Smith beginning in April 2022, and returned to Crain Kia of Bentonville that June.  *Id.* at

¶¶ 19, 24, 42.  On June 6, Taylor's first day back in Bentonville, during the dealership's

Monday morning sales meeting, sales manager Jerry Parker remarked that he wanted to

1

address "the monkey in the room," referring to Taylor's return.  *Id.* ¶¶ 55, 62.  Taylor is Black.  *Id.* at ¶ 1.  He was the only Black person in the meeting.  (Doc. 37-1, p. 176:12–15 (Taylor Depo.)).

Earlier in the meeting, Parker had complained about "getting the monkey off his back," referring to pressure from the dealership's general manager, John Donawho, about the dealership's lagging sales.  (Doc. 46, ¶¶ 57–60).  Crain claims Parker's reference to Taylor as "the monkey in the room" was unintentional—he meant to say "elephant in the room" but mixed his metaphors since he had just commented on the "monkey" on his back.  *Id.* ¶¶ 64–65.  Parker corrected himself and apologized during the meeting, and also apologized to Taylor one-on-one after the meeting.  *Id.* ¶¶ 65–66.

Taylor did not believe that Parker's comment was a mere slip of the tongue.  (Doc. 37-1, pp. 87:9–18, 99:25–100:10 (Taylor Depo.)).  He reported it to the dealership's office administrator, Lindsey Mitchell, the same day.  (Doc. 46, ¶ 67).  Mitchell reported the comment up to Donawho, and the pair contacted Crain's Human Resources Director, Marsha Mason.  (Doc. 46, ¶ 68).  Mitchell or Donawho instructed Taylor to write a statement about what happened.  (Doc. 37-1, p. 99:1–9 (Taylor Depo.); Doc. 45-6, p. 70:19–24 (Donawho Depo.)).  Crain started an investigation, and, in the following days, Mitchell collected written witness statements from the other people who were present at the meeting.  (Doc. 46, ¶ 70).  The statements confirm that Parker referred to Taylor as "the monkey in the room" and reflect that Parker immediately apologized.  Several mention Parker saying that he meant to say "elephant," and a couple describe Parker's statement as "accidental."  (Doc. 37-12).  On June 10, Crain issued Parker a written warning.  (Doc. 37-11).

After the meeting, a coworker, Brenden Stege, came to Taylor's desk and told him that now he couldn't call Taylor a "butthead" or a "butt kisser" because everybody "think[s] [he's] a monkey now." (Doc. 48, recording 8, 03:55).[1]  Taylor also reported this comment to Mitchell and Donawho, and Mitchell met with Stege and "told him to stop the joking around," but he was not disciplined. (Doc. 37-5, pp. 111:3–112:14 (Mitchell Depo.); Doc. 45-6, pp. 119:19–121:4 (Donawho Depo.)).

Over the week and a half following the incident, Taylor had multiple meetings and phone calls with Donawho, Mitchell, or a combination of the two.  Crain contends that Donawho repeatedly requested a written statement "[f]or several days" before Taylor "finally" provided it, based on Donawho's testimony to that effect, but the uncontested facts are that Parker's comment occurred on June 6 and Taylor provided a statement on June 8.  *See* Doc. 46, ¶¶ 55, 84, 85.[2]  In the immediate aftermath, Donawho told Taylor "if you want me to fire him, let me know. You have this man's career in your hand." (Doc. 45-6, p. 68:14–17 (Donawho Depo.)).  Mitchell was in a hurry to get things resolved, and although she had no authority to make decisions about discrimination complaints, she decided "[o]n [her] own initiative" that Taylor needed to quickly decide what should happen to Parker. (Doc. 37-5, pp. 23:20–25, 108:3–13 (Mitchell Depo.)).  Donawho and Mitchell

---

[1] Crain objects to the admissibility of the EEOC's transcripts of audio that Taylor secretly recorded during these meetings.  The Court solely considers the recordings themselves and notes that the recording numbers do not match the numbers listed in the transcripts.  They are cited by the number that appear on the EEOC's USB drive, which was conventionally filed with the Court. (Doc. 48).

[2] Crain's statement of facts says that Taylor "finally submitted his first written statement on *January* 8, 2022," months before the events at issue actually occurred. (Doc. 46, ¶ 85 (emphasis added)).  Crain cites Mitchell's testimony for this fact, which reflects that she received Taylor's written statement on *June* 8. (Doc. 37-5, p. 65:4–7).  The Court assumes this was an inadvertent error.

repeatedly asked Taylor what he wanted to happen to Parker, and Taylor repeatedly deflected, saying it was not his decision to make and they should just follow the employee handbook. (Doc. 48, recording 5, 2:05; recording 6, 0:08, 1:01; recording 7, 3:35, 4:29).

Human Resources Director Marsha Mason agreed; she "did not believe that it should have been on Galen Taylor to make the decision" about what happened to Parker. (Doc. 37-3, p. 44:4–11 (Mason Depo.)). Taylor testified that he didn't want to be the one getting Parker in trouble because he "didn't want the heat brought down on [himself]," but he believed the handbook required Parker's termination and that Crain would terminate Parker without Taylor asking. (Doc. 37-1, pp. 165:25–166:10, 172:13–173:12 (Taylor Depo.)).

Donawho and Mitchell quickly changed course about firing Parker, instead telling Taylor that he needed to sign a statement saying that he felt safe at work or he needed to transfer to the Crain Hyundai across the street. (Doc. 48, recording 1, 00:12; recording 3, 03:10). For his part, Taylor admits that he initially agreed to the transfer, but he testified that he changed his mind and told Donawho the next day that he wanted to stay at Kia. (Doc. 37-1, pp. 167:14–19, 171:15–24). While Crain asserts that Hyundai was "two and a half times more successful than the Kia store," (Doc. 46, ¶ 90), Taylor testified that he changed his mind because he heard from salespeople at Hyundai that "they don't make no money over there," (Doc. 37-1, p. 167:22–25). He testified that, after telling Donawho he did not want to transfer after all, Donawho and Mitchell told him they would tear up the transfer papers. *Id.* at pp. 169:19–170:1, 172:1–4. Indeed, the only piece of transfer paperwork in the record, dated June 9, does not bear Taylor's writing and the pay plan he

4

allegedly filled out is not in the record.  (Doc. 37-15; Doc. 45-6, p. 82:8–21 (Donawho Depo.)).

On Monday, June 13 at 8:23 a.m., Donawho emailed Crain's payroll director that Taylor was transferring to Hyundai "[t]oday."  (Doc. 46-1).  That same day, when Taylor showed up for work at Kia instead of Hyundai, Donawho sent him home for three days to think about what he wanted, and told him he would be terminated if it was not resolved on the third day.  (Doc. 48, recording 2).  Crain contends that Taylor was paid for the three days off, although the time sheet it provides does not reflect that and, in any event, Taylor was paid solely based on commission.  *See* Doc. 46, ¶ 120; Doc. 37-10; Doc. 37-1, p. 50:3–5 (Taylor Depo.).

In various conversations that Taylor recorded at unidentified times throughout this week and a half, Donawho made the following comments:

Donawho: I know you didn't want to leave, . . . so it's either I move you, or I move the whole store. And I'm not moving the whole store.

Taylor: But I didn't do no nothing to the whole store.

Donawho: You just didn't feel safe over there.

Taylor: Yes.

Donawho: So I'm doing what I was supposed to do, and that's, I'm putting you in a safer work environment. If you don't feel safe over there.

* * *

Taylor: I'm trying to sell there. I don't see why I have to leave.

Donawho: Okay, you've told me in your statement that you didn't feel safe. So if you don't feel safe, then I'm moving you out of that environment into a safe environment.

Taylor: But I wasn't the one that caused the trouble, though.

Donawho: You don't understand. You're more than welcome to stay over there if you want, I just need a statement saying that's what you want to do and you are perfectly okay with the way things are, or you can just come over here.

* * *

Donawho: It's either move everybody in the store or move you, and I'm not gonna move everybody in the store.

Taylor: So everybody in the store wants to move?

Donawho: No, nobody wants to move. Nobody wanted you to move. You're the one that didn't feel safe there. You're the one that thought you were in a toxic environment, Galen. So I'm taking you out of a toxic environment where you don't feel safe, and I'm putting you in a stable environment to where you can sell cars and make money.

Taylor: I know, but I wasn't the one that made a racist remark.

Donawho: Okay, it was taken out of context, okay. I've already talked to him. I've written him up. . . . So you don't have to move, but you need to be okay with the situation over there. There are no hard feelings with anybody. We're not expecting you to do anything other than what you're supposed to, like everybody else.

(Doc. 48, recording 4, 00:20, 01:30, 02:45).

Donawho: It was a slip of the tongue. . . . I know personally, Jerry [Parker] is not a racist. I know he doesn't make racist comments. . . . And nobody can say I'm a racist, my mother is full-blooded Vietnamese, so there's nobody more minority than me. . . . I've been called everything under the sun . . . I just let it roll off my back, okay. But that's me. That's not you. You gotta decide what you wanna do. If it's toxic and you don't feel safe over there, then get your stuff and move over here. If you wanna stay over there and you wanna stay part of that team over there, then you need to put it in writing and tell me you're okay with the way things are over there now.

(Doc. 48, recording 3, 02:25).

Donawho: I don't think it was done intentionally. It's not an excuse but I think he – Jerry [Parker]'s a little dyslexia. He has dyslexia. But he wasn't reading anything, so – I don't think it was done intentionally.

(Doc. 48, recording 6, 00:20).

6

> Donawho: So I know what happened. I made a couple phone calls to some people over there. . . . So I'm gonna tell you what happened, okay, and the you tell me what you want to do, okay? . . . It was a Freudian slip, what he said. But at this point here, you've got his career in your life – in you hands. So you tell me what you want to do. . . . So I've made the phone calls, and there's not much investigating to do on it because it was said, okay. But it was said on – it was – it wasn't meant as racial, okay. He just didn't think about what he said. But now you just tell me what you want to do.
>
> * * *
>
> Donawho: I know him personally, and I know he's not prejudiced at all. So if it was anybody else, I wouldn't know any different, but I know he's not prejudiced.

(Doc. 48, recording 8, 00:20, 02:15).

Mitchell testified that Taylor was supposed to come to work on June 16 at 9 a.m. with his decision. (Doc. 37-, p. 75:1–76:18). On the 16th, Mitchell met with Taylor and told him "You need to make your decision on what you want to do, do you want to stay here or go across the street? If you stay here, you have to give a written statement that you choose to work here and that you will feel safe working here." Taylor responded: "I don't want to go across the street, but I also don't want to work with him anymore." (Doc. 48, recording 1, 00:10). Mitchell got Mason on the call, and they gave Taylor a little more time to think about it. (Doc. 46, ¶ 131; Doc. 37-3, p. 47:2–10 (Mason Depo.); Doc. 37-5, p. 75:1–15 (Mitchell Depo.)). Mason did not know that Donawho and Mitchell were requiring Taylor to attest that he "felt safe" in order to stay on at Kia nor did HR require such a statement. (Doc. 37-3, pp. 46:1–22, 49:16–25 (Mason Depo.)). After some more time to think about it, Taylor maintained that he wanted to stay at Kia but he had not agreed to sign a statement that he "felt safe," so Donawho decided to terminate him. (Doc. 37-5, p. 78:8–16 (Mitchell Depo.); Doc. 37-3, pp. 50:7–51:1 (Mason Depo.)).

On the termination report completed by Donawho dated June 16, the reason for termination is listed as "90 day period."  (Doc. 37-14).  In his deposition, Donawho offered conflicting testimony about why Taylor was terminated, initially testifying that it was "because he kept changing his mind," (Doc. 45-6, p. 83:14–23), but later denying that it was "because he was undecisive [sic]" and instead citing "his performance, his attendance," *id.* at p. 95:11–17.

Donawho testified that he had terminated "maybe two people, three people the entire five years" he was at Crain.  (Doc. 45-6, p. 41:21–24).  Donawho, in his own words, "had issue with Mr. Parker," similar to the one that he claims justified firing Taylor: "[Parker] just wasn't following the processes. . . . He wasn't making his phone calls. He wasn't getting up and talking to customers."  *Id.* at p. 66:10–18.  And Donawho did not testify about any other occasions when he had terminated someone based on their probationary status; in fact, he testified that he had allowed a probationary employee to take leave to go to rehab for his drinking problem.  *Id.* at pp. 62:10–63:4.

After his termination, Taylor timely filed a charge of discrimination with the EEOC on August 25, 2022, alleging race and national origin discrimination and retaliation.  About a year later, on August 8, 2023, the EEOC issued a Letter of Determination finding reasonable cause to believe Crain violated Title VII by discharging Taylor in retaliation for reporting an incident of racial harassment.  On August 22, after communications with Crain's counsel, the EEOC issued a Notice of Failure of Conciliation before filing the instant suit on September 28.  (Docs. 2 & 22-1).

## II.  LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir 1999) (quoting Fed. R. Civ. P. 56).  The same standard applies where, as here, the parties have filed cross-motions for summary judgment.  Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).  "To be material, a fact must 'affect the outcome of the suit under the governing law.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient' to survive summary judgment." *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Liberty Lobby*, 477 U.S. at 252).  The moving party bears the burden of proving the absence of any material factual disputes and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts

to raise a genuine issue for trial.  *See Liberty Lobby*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Court must base its determination of whether a genuine issue of material fact exists on "evidence that will be admissible at trial.  [T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form."  *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (alteration in original) (internal quotations and citations omitted).  When video footage "blatantly contradicts" the non-movants account of events such that "no reasonable jury could have believed him," courts should not "rel[y] on such visible fiction" and must instead "view[ ] the facts in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

## III.  DISCUSSION

Title VII prohibits discrimination in the terms and conditions of employment based on an employee's race.  It also prohibits retaliation against employees who oppose race discrimination in employment.  Title VII contains certain administrative prerequisites to suit.  As relevant here, when the EEOC wishes to bring suit on behalf of a charging party, it must first attempt to informally resolve the dispute with the employer, a process referred to as conciliation.  The Court first address the EEOC's conciliation efforts in this case before turning to the merits of its retaliation claim.

### A.  Conciliation

The parties filed cross motions for partial summary judgment on the sufficiency of EEOC's conciliation efforts (Docs. 22 & 40).  In response to Crain's motion, EEOC moves

to strike certain materials presented by Crain that EEOC claims violate Title VII's confidentiality provision (Doc. 51).

"Title VII of the Civil Rights Act of 1964 sets out a detailed, multi-step procedure through which the Commission enforces the statute's prohibition on employment discrimination."  *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 483 (citation omitted) (2015).  When an employee reports an unlawful employment practice to the EEOC, Title VII directs the EEOC to "make an investigation thereof."  42 U.S.C. § 2000e-5(b).  "If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."  *Id.*  "The statute leaves to the EEOC the ultimate decision whether to accept a settlement or instead to bring a lawsuit.  So long as 'the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission' itself, the EEOC may sue the employer."  *Mach Mining*, 575 U.S. at 483–84 (quoting § 2000e–5(f)(1)).

To facilitate conciliation, the statute contains a confidentiality provision: "Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned."  § 2000e-5(b).  This provision requires consent from "both the employer and the complainant."  *Mach Mining*, 575 U.S. at 492.

The Supreme Court in *Mach Mining* held that the EEOC's conciliation efforts are subject to limited judicial review to determine whether the EEOC "inform[ed] the employer

11

about the specific allegations" and "tr[ied] to engage the employer in some form of discussion (whether written or oral)."  575 U.S. at 494.  "A sworn affidavit from the EEOC stating that it has performed the obligations noted above but that its efforts have failed will usually suffice to show that it has met the conciliation requirement." *Id.* at 495.  Here, the EEOC has provided the signed declaration of the then-Acting District Director of the EEOC office that investigated this case which states that "[o]n August 8, 2023, the Commission issued to Defendant Crain Kia a Letter of Determination . . . finding reasonable cause to believe Defendant violated Title VII of the Civil Rights Act of 1964 by discharging Taylor in retaliation for reporting an incident of racial harassment."  (Doc. 22-1, ¶ 7).  The Declaration further states that "the Commission engaged in written and oral communication with Crain Kia to provide Crain Kia with the opportunity to remedy the discriminatory practices" but the "communications did not result in a conciliation agreement that was acceptable to the Commission." *Id.* ¶ 11.  Ordinarily, this would satisfy the Court that the EEOC had performed its pre-suit obligations.

But here, Crain contests the adequacy of the EEOC's conciliation efforts.  If an employer counters the EEOC's affidavit with "credible evidence of its own, in the form of an affidavit or otherwise, indicating that the EEOC did not provide the requisite information about the charge or attempt to engage in a discussion about conciliating the claim, a court must conduct the factfinding necessary to decide that limited dispute." *Mach Mining*, 575 U.S. at 495.

Crain purports to "dispute" that the EEOC communicated with Crain to attempt informal resolution, asserting that "[t]he Commission attempted to prematurely engage Crain in settlement negotiations without conducting a complete investigation and

presented Crain with non-negotiable terms in a conciliation agreement."  (Doc. 41, ¶ 4).  But the denial contains the admission: the EEOC presented Crain with a conciliation agreement.  And Crain's own evidence confirms the EEOC's declaration: the EEOC sent Crain a Letter of Determination on August 8, 2023, which states that "Charging Party alleges respondent disciplined, suspended, and discharged him because of his race, Black, national origin, African American, and in retaliation for reporting a racial harassment incident in violation of Title VII."  (Doc. 40-3).  After receiving the letter, Crain's counsel exchanged emails with the EEOC about the Letter of Determination and the possibility of resolution—the existence of these emails demonstrates the truth of the EEOC's declaration and proves that the conciliation efforts extended beyond mere "bookend letters."  *See* Doc. 40-4; *Mach Mining*, 575 U.S. at 490.  Thus, there is no genuine factual dispute about the conciliation efforts themselves.

Instead, Crain's real gripe with the EEOC is that it should have done more investigation and disclosed the fruits of that investigation with Crain before attempting conciliation.  *See* Doc. 42, p. 6–8.  Title VII's only relevant command about investigations is that the EEOC "shall make" one.  § 2000e-5(b); *see id.* § 2000e-8 (granting the EEOC certain investigative powers and imposing record-retention requirements).  The statute contains no directives about the investigation's scope.  Crain relies on *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657 (8th Cir. 2012).  There, the EEOC brought a sexual harassment suit on behalf of a class of employees without first investigating the allegations of some 67 putative class members.  *Id.* at 673.  The Eighth Circuit noted, "at the time the EEOC issued the Letter of Determination . . . , 27 of the remaining 67 allegedly aggrieved persons *had not yet been sexually harassed*."  *Id.*  That situation,

where the EEOC did not investigate claims *at all* before making a reasonable-cause determination, is not analogous to this one, where the EEOC did conduct some investigation of Taylor's claims prior to the Letter of Determination.  Therefore, the Court follows the "general rule [that] 'the nature and extent of an EEOC investigation into a discrimination claim is a matter within the discretion of that agency" and does not review the extent of the EEOC's investigation into Taylor's claim.  *Id.* at 674 (quoting *EEOC v. KECO Indus., Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984)).

Turning to Crain's demand for "the exchange of information," Crain does not cite, and the Court is not aware of, any requirement that the EEOC disclose its evidence to an employer before attempting conciliation.  The Supreme Court described the information the EEOC must disclose prior to conciliation as only "what the employer has done and which employees (or what class of employees) have suffered as a result."  *Mach Mining*, 575 U.S. at 494.  Here, that information was provided, the EEOC presented Crain with a conciliation agreement, and the parties thereafter exchanged written communications about settling the case.  Nothing more was required of the EEOC.  *Id.* at 492 ("Congress granted the EEOC discretion over the pace and duration of conciliation efforts, the plasticity or firmness of its negotiating positions, and the content of its demands for relief.  For a court to assess any of those choices . . . extends [judicial review] too far.").

Crain relies on *E.E.O.C. v. OhioHealth Corp.*, 115 F. Supp. 3d 895 (S.D. Ohio 2015), for many of the extra-textual investigation and conciliation requirements it seeks to impose on the EEOC.  The Court is in good company in finding *OhioHealth* unpersuasive.  *See E.E.O.C. v. Mach Mining, LLC*, 161 F. Supp. 3d 632, 635 (S.D. Ill. 2016); *E.E.O.C. v. Dimensions Healthcare Sys.*, 188 F. Supp. 3d 517, 523 n.6 (D. Md.

2016); *E.E.O.C. v. Amsted Rail Co.*, 169 F. Supp. 3d 877, 885–86 (S.D. Ill. 2016). Crain challenges the EEOC's proposed conciliation agreement as an impermissible take-it-or-leave-it offer which would impose unsupported damages and unauthorized remedial measures. (Doc. 42, pp. 4, 9–10). And it asserts that the EEOC's refusal to "provide factual documentation" deprived it of a "reasonable chance to rebut information." *Id.* at pp. 8–9. The Supreme Court has already rejected these arguments. *Mach Mining*, 575 U.S. at 491–92 (finding that requiring the EEOC "to lay out 'the factual and legal basis for' all its positions, including the calculations underlying any monetary request" and "refrain from making 'take-it-or-leave-it' offers" would "conflict[ ] with the latitude Title VII gives the Commission"). The EEOC's Partial Motion for Summary Judgment (Doc. 22) is **GRANTED** and Crain's Cross Motion (Doc. 40) is **DENIED**.

The EEOC asks the Court to strike two of Crain's summary judgment exhibits and portions of Crain's motion (Doc. 40), statement of facts (Doc. 41), and brief in support (Doc. 42) that purportedly violate Title VII's confidentiality provision. (Doc. 52). The exhibits are: (1) emails exchanged between the EEOC and Crain's attorney on August 8–14, 2023, relating to settling the case, (Doc. 40-4); and (2) the EEOC's proposed conciliation agreement sent to Crain on August 8, (Doc. 40-5). The EEOC argues that § 2000e-5(b) bars Crain from relying on, or even disclosing, these materials because they constitute things "said or done during and as part of" conciliation efforts for which Crain has not obtained "the written consent of the persons concerned," namely, the EEOC itself and charging party Galen Taylor.

The Court has no trouble concluding that the two challenged exhibits constitute things said or done during and as part of conciliation efforts. Crain's argument that it is

entitled to rely on this evidence under *Mach Mining*, *see* Doc. 57, ¶ 10, was in fact squarely rejected in *Mach Mining*:

> Mach Mining's brand of review would also flout Title VII's protection of the confidentiality of conciliation efforts. . . . The proof is in this very case: The District Court held that it could not strike from the record descriptions of the conciliation process because they spoke to whether the EEOC had made a "sincere and reasonable effort to negotiate." The court thus failed to give effect to the law's non-disclosure provision.

575 U.S. at 492–93 (citation omitted).

The EEOC's Motion to Strike (Doc. 51) is **GRANTED** with respect to Crain's Exhibit D and E (Docs. 40-4 & 40-5); paragraphs 57–59, 61–63, 65–66, and 68 of Crain's statement of facts (Doc. 41);[3] and the following portions of Crain's brief in support (Doc. 42):

- Pages 7–8: From "But the Commission" to "emotional distress.";

- Pages 9–10: From "For example" to "$3700.";

- Page 11: The sentence that begins "Without performing any investigation,";

- Pages 11–12: From "On August 14," to "(Ex. G)."

These items are accordingly **STRICKEN** from the record.

Crain argues that even if these items are confidential, "the appropriate remedy is not to strike the documents, but rather seal them for *in camera* review." (Doc. 57, ¶ 16). Such a remedy would be contrary to the statutory text which provides that confidential materials may not be "used as evidence in a subsequent proceeding." § 2000e-5(b). "[S]ealing the [documents], as opposed to striking [them] entirely, would not serve the purpose of giving parties some degree of a guarantee that statements made during

---

[3] Although some of these paragraphs do not cite directly to the disputed exhibits, they nonetheless purport to state the terms of the EEOC's proposed conciliation agreement.

conciliation would not 'come back to haunt them in litigation.'" *E.E.O.C. v. CRST Int'l, Inc.*, 351 F.Supp.3d 1163, 1175 (N.D. Iowa 2018) (quoting *Mach Mining*, 575 U.S. at 493).

Crain points out that some of the facts the EEOC challenges were not part of conciliation efforts and are therefore not confidential.  (Doc. 57, ¶ 7).  The EEOC, by contrast, asserts that Crain's statement of facts includes "inappropriate and incorrect factual and legal conclusions." (Doc. 52, p. 5).  The Court agrees that Crain has incorrectly characterized its conclusions as fact in its statement of facts (Doc. 41), specifically paragraphs 37 and 55, and the Court does not consider those statements in ruling on these motions, but the Court need not strike them from the record.

Finally, Crain argues that statements and evidence about the EEOC's general investigative practices and how they were applied here are not confidential.  The only remaining statement that this argument pertains to is paragraph 44, which states "The Commission does not know why there is not [sic] corresponding Compensatory damages worksheet or interview in Taylor's investigative file."  While the Court, as previously discussed, will not review the extent of the EEOC's investigation, this statement and the supporting evidence about the EEOC's investigative efforts is not protected by § 2000e-5(b)'s confidentiality requirement, and therefore need not be stricken.  The EEOC's Motion is therefore **DENIED** with respect to all items not heretofore stricken.

## B. Retaliation

"Title VII prohibits retaliation against an employee 'because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011)

17

(alterations in original) (quoting § 2000e-3(a)). "To defeat summary judgment, a plaintiff must produce either direct evidence of discrimination or create an inference of it under the *McDonnell Douglas* burden-shifting framework." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (citation omitted). Crain moves for summary judgment on the EEOC's retaliation claim, arguing that the EEOC cannot create an inference of discrimination under *McDonnell Douglas*. The EEOC asserts that it has sufficient evidence to prove retaliation either directly or via burden-shifting.

### 1. Direct Evidence

EEOC offers various statements Donawho made in recorded conversations[4] with Taylor as direct evidence of retaliation. "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 68 (2006)). "A plaintiff with strong (direct) evidence that illegal

---

[4] In its Reply (Doc. 55), Crain asserts that the Commission's *transcripts* of conversations Taylor recorded are inadmissible and should be excluded from the Court's consideration. *Id.* at p. 2. Crain only claims that the recordings themselves are inadmissible in the heading to the section discussing the transcripts and in a passing reference to Federal Rule of Evidence 106, the Rule of Completeness. *Id.* at pp. 1–2. But Rule 106 is a rule of inclusion, not exclusion. It provides that "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 does not require the Court to exclude the recordings because they may be incomplete. The Court has listened to the recordings, independent of the transcripts, and relies only on the recordings themselves in its analysis. In its consideration of the recordings' admissibility, the Court has not considered Crain's conclusory assertions of inadmissibility in its Reply to Plaintiff's Response to Crain's *Statement of Facts* (Doc. 56) which is of dubious propriety as a reply in support of a motion for summary judgment and, at 61 pages, is well in excess of the 7-page limit for such a reply, *see* Doc. 20, ¶ 5.

discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

Both parties cite the Eighth Circuit's decision in *Pye v. Nu Aire, Inc.*, 641 F.3d 1011 (8th Cir. 2011), the EEOC to analogize and Crain to distinguish.  There, Pye, a Black employee reported his employer's payroll administrator, Holladay, for referring to him by a racial epithet and repeatedly failing to submit the paperwork that he needed to receive housing assistance, which he ultimately lost out on.  *Id.* at 1015–16.  The administrator's supervisor and friend, Johnson, conducted the investigation; the supervisor stated that "she was 'very upset at the allegations'" against Holladay, "did not believe Pye's allegation that Holladay had referred to him" by a racial epithet, and "had known Holladay for many years" and "Holladay was not a racist."  *Id.* at 1016.  Johnson and Pye's own supervisor, McKnight, met with Pye. During the meeting:

> Johnson asked him, with disdain, what he wanted to make the problem go away. Pye responded that he wanted to be helped or compensated for what had occurred. Johnson continued to ask him what he wanted to make the problem go away. Pye turned to McKnight and said he had been requesting to move into different jobs in the company, at which point Johnson asked him if he wanted a position with more money, more benefits, or perhaps with a company car. Pye asked what was usually done in this type of situation, and stated that he wanted the matter handled in the usual manner. He also responded that a company car would be nice.

*Id.*  After the meeting, Johnson emailed a higher-up that Pye "'was shaking [them] down'—that he wanted a promotion, money, and a company car 'for his trouble.'"  *Id.*  The higher-up directed the supervisor to fire Pye; Pye was told he was fired "for attempting to obtain a promotion and/or money and a company car through coercion or intimidation."  *Id.*  The court held that, on this version of events, Pye's "comments at the meeting would . . . have been protected conduct."  *Id.* at 1021.

19

The instant case bears a striking resemblance to *Pye*. After conducting the investigation, Donawho told Taylor that Parker's monkey comment "was a slip of the tongue," "it wasn't meant as racial," and that Parker "is not a racist," he "doesn't make racist comments." (Doc. 48, recording 3, 02:25; recording 8, 01:10). Donawho and Mitchell repeatedly asked Taylor what he wanted to happen, and Taylor repeatedly told them they should follow the handbook and he wanted to stay at Kia. Donawho repeatedly emphasized to Taylor that his statement that he didn't feel safe was the reason he could not stay at Kia. He was ultimately terminated for, on Crain's account, failing to make up his mind about how it should resolve his complaint. Like *Pye*, "the evidence shows that [Taylor's] termination was a direct result of his complaint of discrimination and his suggestions of remedies, prompted by the investigator's questions." *Id.* at 1021.

Crain's attempts to distance Donawho's statements from Taylor's termination are unavailing, as is its attempt to limit *Pye* to its facts. Crain argues that putting Taylor to the choice between attesting that he "felt safe" at work or agreeing to be transferred to a dealership which he had already made known he did not want to be transferred to was just asking for his "good faith participation in his employer's investigation into his complaint." (Doc. 55, p. 4). But Taylor's statements that he wanted to remain at Kia and that he did not feel safe there are protected conduct—so he could not be fired for them. *Gilooly v. Mo. Dep't. of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005) (holding that an employee's statements during the investigation of his charge of discrimination that are related to the substance of the investigation—even those that the employer deems deceptive—are within the scope of protected activity). And *Pye* established that an employee's suggestion of remedies in response to his employer's demand for such

suggestion is not, by itself, a legitimate basis for termination separate and apart from the protected conduct itself.

Try as it might, Crain cannot get around Title VII's anti-retaliation provision by putting an employee in a Catch-22 between withdrawing his indisputably protected statement or accepting an undesirable reassignment and then firing him for failing to choose. And a reasonable jury could credit Taylor's testimony and conclude that he did choose: although he initially agreed to the transfer, he changed his mind almost immediately; promptly informed Donawho, who said he would tear up the transfer papers; and then maintained until his termination that he wanted to remain at Kia. The EEOC has established an unbroken chain between Taylor's protected conduct and his termination.

### 2. *McDonnell Douglas*

The result is the same under *McDonnell Douglas*'s burden-shifting framework. The plaintiff bears the initial burden to establish a prima facie case by showing: (1) he engaged in protected conduct; (2) the employer took an adverse action against him; and (3) there was a causal connection between the adverse action and the protected activity. *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th Cir. 2017). "The burden to show a prima facie case is not difficult." *Id.* (citation omitted). Once the plaintiff makes out a prima facie case, the burden "shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* "If the employer articulates a legitimate reason for the adverse employment action, the plaintiff may create a triable question as to retaliation by showing the employer's articulated reason was not the true reason for the adverse action," i.e., the reason offered is pretextual. *Id.*

With respect to the EEOC's prima facie case, Crain does not dispute that Taylor's complaint to Mitchell about Parker's "monkey" comment nor his written statement about that comment qualify as protected conduct. *See id.* (citing *Helton v. Southland Racing Corp.*, 600 F.3d 954, 961 (8th Cir. 2010) for the proposition that "reporting alleged harassment" can be "protected conduct for purposes of a retaliation claim" even "where alleged harassment did not itself constitute an actionable wrong"). Crain also does not dispute that termination is an adverse employment action. Instead, Crain argues that Taylor's protected conduct was not the cause of Taylor's termination.

Crain says "[t]iming alone has never been sufficient to establish causation in a retaliation case." (Doc. 39, p. 6 (citing *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847 (8th Cir. 2005))). But that's wrong. While "'[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation,' . . . in some cases [the Eighth Circuit] ha[s] held close temporal proximity to be sufficient as a matter of law to demonstrate causal connection." *Cheshewalla*, 415 F.3d at 852 (first alteration in original) (citations omitted) (first quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc); and then citing *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir. 1989)).

Taylor was fired at most ten days after his complaint. *See* Doc. 46, ¶ 122 (parties dispute whether Taylor was fired on the 13th or the 16th). "These two events are extremely close in time" such that temporal proximity alone may be enough to establish the "minimal showing" necessary "before requiring the employer to explain its actions." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (finding plaintiff had

established causation element of prima facie case under *McDonnell Douglas* where protected leave began thirteen days before termination).

But the EEOC need not and does not rely on temporal proximity alone.  Even on Crain's account, one cause of his termination—his purported failure to make up his mind between transferring and withdrawing his statement—is "not sufficiently independent" of his protected conduct.  *Gilooly*, 421 F.3d at 740.  Crain asserts that Taylor "refused to participate in good faith in Crain's investigation" which serves as an "intervening act[ ] that breaks the temporal connection."  (Doc. 39, p. 8).  This assertion is based upon its interpretation of Taylor's change of heart about transferring as an attempt to "misle[a]d and deceive[ ] Donawho during the investigation several times."  *Id.*  An employer cannot defeat a Title VII claim by simply labeling an employee's statements in the course of investigating that claim "deceptive."  *See Gilooly*, 421 F.3d at 740 ("It cannot be the case that any employee who files a Title VII claim and is disbelieved by his or her employer can be legitimately fired.").  And, based on the evidence in the record, a reasonable jury could conclude that Taylor only changed his mind once after initially agreeing to the transfer, which could hardly be considered misleading or deceptive.

Moreover, both Taylor's refusal to state that he "felt safe" at Kia and his suggestion of remedies in response to Crain's questioning are not legitimate bases for termination.  *See id.*; *Pye*, 641 F.3d at 1021.   And unlike *Cheshewalla*, where the Eighth Circuit noted that the plaintiff was "[w]ithout any evidence of retaliation," here, Taylor has presented Donawho's statements, discussed above, which support his claim that his termination was retaliatory, and Crain's own reasons for his termination are protected conduct or at

least closely related to it.  415 F.3d at 852.  The EEOC has made out a prima facie case of retaliation.

Because the EEOC has made out a prima facie case of retaliation, the burden shifts to Crain to articulate a legitimate, non-retaliatory reason for firing Taylor.  Crain offers the following: Taylor was an at-will, probationary employee; Taylor "lack[ed] candor" and "stalled Crain's investigation" by not making up his mind; and Taylor did not sell any cars during the week he was employed.  (Doc. 39, pp. 10–11).

Crain's first purported justification, that Taylor was an at-will, probationary employee, appears to miss the "burden-shifting" piece of the equation.  First of all, whether Taylor was or was not a probationary employee is hardly the critical distinction Crain makes it out to be.  Factually, under Crain's employee handbook, both probationary *and* non-probationary employees were employed at will.  (Doc. 37-9, p. 7).  Legally, "probationary" or new employee status has no bearing on one's entitlement to Title VII's protection from retaliation.  Even prospective employees are entitled to the law's protection.  § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees **or applicants for employment** . . . because he has opposed any [unlawful employment] practice . . . .").  Second, since Taylor made out a prima facie case of discrimination, Crain bears the burden of offering a reason for his termination.  At-will employment is not a get-out-of-Title-VII-free card, and "Taylor was an at-will employee with no guarantee of employment with Crain" is not a reason for his termination.  (Doc. 39, p. 10).

Crain's second justification, that Taylor lacked candor and stalled its investigation is arguably within the scope of the protected activity.  As already discussed, Taylor's

24

statements that he wanted to remain at Kia while failing to withdraw his statement that he did not feel safe working there are protected conduct under *Gilooly* and *Pye*. Even if they were not, the EEOC has presented evidence on which a reasonable jury could find this justification pretextual.

"An employee can prove that [his] employer's articulated justification for an adverse employment action is pretext either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Pye*, 641 F.3d at 1021 (internal quotations omitted) (first alteration in original) (quoting *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1046 (8th Cir. 2010)).[5] In addition to its argument about Taylor impeding the investigation, Crain also asserts that, during his one week at Kia post-return, he did not perform well and failed to sell any cars. But a reasonable jury could conclude that Crain had no issue with Taylor's performance: It appears from the record that if Taylor had agreed to be transferred to Hyundai on June 16, he would have been allowed to keep his job. The Court sincerely doubts that any employer would transfer an employee to, on the employer's account, a more desirable location, *see* Doc. 38, ¶¶ 93–94, in response to that employee's flagging performance, dishonesty, and poor "[a]ttitude, character, and work ethic," (Doc. 39, p. 13). And Crain surely does not contend that the mere refusal to agree to what was, according to Taylor, a retaliatory transfer is a legitimate, non-retaliatory reason for termination.

---

[5] Crain argues that Taylor has failed to show pretext because he has not presented any similarly situated comparators. However, similarly situated comparator evidence is just one of several ways that an employee can prove pretext. *See Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014).

And finally, Taylor has offered additional evidence from which a jury could conclude that retaliation was the real reason for Taylor's termination: Donawho said that he did not think Parker was prejudiced or that the monkey comment was racist, Donawho implied that Taylor's statement and not Parker's comment was the real problem, and Donawho terminated Taylor when Taylor refused to accept an allegedly retaliatory transfer or to withdraw his statement.  Because a reasonable jury could be persuaded that retaliation was the real reason for Taylor's termination, Crain's Motion for Summary Judgment (Doc. 37) is **DENIED**.

## IV.  CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that the EEOC's Motion for Partial Summary Judgment (Doc. 22) is **GRANTED**, Crain's Cross Motion (Doc. 40) is **DENIED**, and the EEOC's Motion to Strike (Doc. 51) is **GRANTED IN PART AND DENIED IN PART**.  Crain's Motion for Summary Judgment (Doc. 37) is **DENIED**.

**IT IS SO ORDERED** on this 23rd day of May, 2025.

*/s/ Timothy L. Brooks*
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE